THE DRUMMOND TOBACCO COMPANY, Appellant, v. THE
ADDISON TINSLEY TOBACCO COMPANY,
Respondent.

St. Louis Court of Appeals, December 13 and 27, 1892.

1. Trademarks, Infringement of: SUFFICIENCY OF IMITATION. In
order to entitle the owner of a trademark to relief against imitation,
it must appear that the similarity between the trademark and the
alleged infringement was such as to deceive the ordinary consumer
of the article to which the same was attached; but it is not necessary
to establish that anyone was actually deceived by the imitation.

2. ———: ———: INSPECTION: EXPERT EVIDENCE. While the main
test of the alleged resemblance is an inspection by the court of the
original trademark and of the alleged infringement, nevertheless, in
determining whether an ordinary customer, having neither the oppor-
tunity for comparison nor the time for examination, would be likely
to be deceived by the similarity, the opinion of witnesses familiar
with the trade, and the habits of the customers, is of weight, and,
when aided by evidence of actual deception, should be controlling,
unless the dissimilarity between the two marks is such as to exclude
any probability of deception.[f]

The Drummond Tobacco Co. v. The Tinsley Tobacco Co.

3. ———: ———: EFFECT OF FRAUDULENT DESIGN. While a fraudulent design need not be shown in order to entitle the owner of a trademark to the protection of his proprietary rights by injunction, when an interference therewith has been established by unequivocal proof, still less cogent evidence of the probability of deception by means of the imitation will suffice when an intention to deceive has been shown. In such a case it is not necessary that the resemblance between the trademark and the imitation should be so close as to deceive purchasers exercising ordinary care and prudence, but only that the similitude should be sufficient to deceive the incautious and unwary.

4. ———: RIGHT OF OWNER OF TRADEMARK TO AN ACCOUNTING. This cause was one to enjoin an infringement of the plaintiff's trademark. The defendant had used the imitation in various shapes and forms for many years, and for part of the time without active objection on the part of the complainant. During this use, different changes in the shape and general appearance were introduced in the course of attempts at an amicable adjustment between the parties, and by reason of these matters a proper accounting was rendered difficult. Under these circumstances the accounting prayed for by the plaintiff was denied, without prejudice to his right to proceed at law for damages, if so advised.

5. ———: JURISDICTION, APPELLATE: AMOUNT INVOLVED. It appeared that the defendant had spent $10,000 in advertising its brand of goods, to which its trademark was affixed. The decree rendered in this court restrained the defendant from using the alleged infringement, or any colorable imitation of the plaintiff's trademark, but did not prohibit the defendant from advertising its brand of goods, and, morover, permitted the defendant to change its trademark into a form theretofore agreed upon by it and the plaintiff. *Held*, on motion for a transfer of this cause to the supreme court, after the decision thereof by this court, that this court had jurisdiction of the appeal taken from the trial court herein.

*Appeal from the Louisiana Court of Common Pleas.*
HON. E. M. HUGHES, Judge.

REVERSED *(and decree entered in this court)*.

*Smith & Harrison, D. P. Dyer* and *W. H. Morrow,* for appellant.

(1) A manufacturer, adopting a certain symbol or device and affixing it to his goods as a trademark, if

the same be in law a proper trademark, acquires an exclusive right to the use of that particular symbol or device, in connection with that particular class of goods which he so manufactures and stamps with such symbol or device; and he is entitled to the interposition of a court of equity to enforce this right by perpetual injunction against anyone invading it. High on Injunction [3 Ed.] sec. 1085; *Taylor v. Carpenter*, 11 Paige, 292; *Hostetter v. Vowinkle*, 1 Dillon, C. C. 329. (2) The jurisdiction of the courts in trademark cases seemed originally to rest on fraud upon the part of defendant; but the test is not whether the offending party intended to commit the fraud to deceive; but it consists in actual deception or the creation of a possibility of deception, independent of any actual fraudulent intent. *Delaware v. Clark*, 7 Blatch. 112; *Croft v. Day*, 7 Beav. 84; *Curtis v. Bryan*, 2 Daly, 312; *Messerole v. Tynberg*, 36 How. Pr. 14; *Lockwood v. Bostwick*, 2 Daly, 521; *McCann v. Anthony*, 21 Mo. App. 83; *Coffeen v. Brunton*, 3 McLean, 516; *Davis v. Kendall*, 2 R. I. 566; *Edelston v. Vick*, 11 Hare, 78; *Clement v. Maddock*, 5 Jur. (N. S.) 592; *Cartier v. Cartier*, 31 Beav. 292; *Harmon v. Taylor*, 11 Jur. (N. S.) 408; *Glenny v. Smith*, 11 Jur. (N. S.) 964; *Crucible Co. v. Guggenheim*, 2 Brewst. 321; *Millington v. Fox*, 3 My. & Cr. 338; *Hall v. Barrows*, 33 L. R. Ch. 204; *Mfg. Co. v. Wilson*, 2 Ch. D. 434–53; *Mfg. Co. v. Spear*, 2 Sand. S. C. Rep. 599. (3) The legal test is not whether a wary or cautious man, or one skilled in that particular business, would be likely to be misled by the imitation; but whether it is such as would likely deceive the ordinary purchaser, purchasing with ordinary caution, or the careless and unwary. *McCann v. Anthony*, 21 Mo. App. 83, 88–90; High on Injunction [3 Ed.] secs. 1088–1089; Sebastian on the Law of Trade-Marks [2 Ed.] 121, and cases cited; *Seixo v. Provezende*,

L. R. 1 Chan. App. Cas. 192; *Williams v. Spence*, 25 How. Pr. Rep. 366; *Celluloid Co. v. Mfg. Co.*, 32 Fed. Rep. 94; *Glenny v. Smith*, 11 Jur. (N. S.) 964; per Lord CHELMSFORD in *Witherspoon v. Currie*, L. R. 5 H. L. 508; *In re Farina*, 27 W. R. 456; *Burrows v. Knight*, 6 R. I. 434; *McLean v. Fleming*, 96 U. S. 245; *Gorham Co. v. White*, 14 Wall. 511; *Godillot v. Harris*, 81 N. Y. 263; *Colman v. Crump*, 70 N. Y. 573; *Leidersdorf v. Flint*, 50 Wis. 401; *Clark v. Clark*, 25 Barb. 79; *Brooklyn, etc., v. Masuary*, 25 Barb. 416. (4) Nor is the legal test, whether seen side by side the two symbols would deceive the ordinary purchaser into mistaking the one for the other, but whether the defendant's tobacco, stamped with its mark and separately exposed for sale, would probably be mistaken by purchasers for the plaintiff's tobacco to which its "horseshoe" trademark is affixed. High on Injunction [3 Ed.] sec. 1088; *Wilson v. Crowley*, 3 Blatch. 340; *Lockwood v. Bostwick*, 2 Daly, 521; *Fertilizer Co. v. Woodside*, 1 Hughes' U. S. C. C. 115; *Mfg. Co. v. Leudeling*, 22 Fed. Rep. 823; *Seixo v. Provezende*, L.R. 1 Ch. App. 192; *Cook v. Starkweather*, 13 Abb. Pr. (N. S.) 392; *Colman v. Crump*, 70 N. Y. 573; *Sohl v. Geisendorf*, 1 Wilson (Ind.) 60; *Mfg. Co. v. Trainer*, 101 U. S. 64. (5) When there is evidence showing in point of fact some persons have actually been deceived, although heedless, unwary and incautious, the evidence of other witnesses to the effect that in their opinion persons could not be deceived is of no value; and when one person has adopted the trademark of another, or a mark resembling it, and there is evidence, as here, of actual deception, that is to say, "that anyone has in fact been thereby induced to buy the defendant's goods as being the goods of the plaintiff, the question has been decided by the test of the facts, and the court will restrain the defendant

without further inquiry." *Glenny v. Smith*, 2 DeG. & Sm. 476; s. c., 11 Jur. (N. S.) 964; *Woolam v. Ratcliff*, 1 H. & M. 259. "The best evidence of course would be instances of actual deception." *Cook v. Starkweather*, 13 Abb. Pr. (N. S.) 392–400. (6) Although the wholesalers or retailers to whom the defendant may have sold the tobaccos stamped with its mark may not have been deceived, yet if the consumer was deceived the right of action exists, and the permanent injunction should be granted. *Sykes v. Sykes*, 3 B. & Cr. 541; *Farina v. Silverlock*, 1 K. & J. 509; *Chappel v. Davidson*, 2 K. & J. 123; *Rose v. Loftus*, 47 L. J. Ch. 576; *Mfg. Co. v. Loog*, 18 Ch. Div. 412; *Crucible Co. v. Guggenheim*, 2 Brews. 321–325; *Mfg. Co. v. Wilson*, 2 Ch. Div. 434.

*Fagg & Ball* and *Gibson, Bond & Gibson*, for respondent.

(1) No trader can adopt a trademark so resembling that of another trader that ordinary purchasers buying with ordinary caution are likely to be misled. *McLean v. Fleming*, 96 U. S. 245; *Tobacco Co. v. Tobacco Co.*, 104 Mo. 53; *Filley v. Fassett*, 44 Mo. 168; *Mfg. Co. v. Trainer*, 101 U. S. 51; *McCartney v. Garnhart*, 45 Mo. 593; *Fish Co. v. Wooster*, 28 Mo. App. 408; *McCann v. Anthony*, 21 Mo. App. 83; *Sanders v. Jacobs*, 20 Mo. App. 95. (2) Where ordinary attention will enable purchasers to discriminate, the court will not interfere. *Ball v. Seigil*, 116 Ill. 137; *Reed v. Richardson*, 45 L. T. N. S. 54; *Beard v. Tannon*, 13 L. T. N. S. 746; *Leidersdorf v. Flint*, 50 Wis. 401; *Eggers v. Hink*, 63 Cal. 405; *Bell v. Lock*, 8 Paige, 75; *Stevens v. Deconto*, 7 Robertson, 343; *Talcott v. Moore*, 6 Hun, 106; *Pub. Ass'n v. Pub. Co.*, 51 How. Pr. 402. (3) The court is not bound to interfere where ordinary attention will enable purchasers to discriminate between trademarks used by different

persons. *Popham v. Coal Co.*, 66 N. Y. 69; 82 N. Y. 519–523; *Partrige v. Menk*, 2 Sandf. Ch. 622; *Stokes v. Landgraf*, 17 Barb. 608; *Corben v. Gould*, 133 U. S. 308; *Tobacco Co. v. Finzen*, 128 U. S. 122; *Blackwell v. Wright*, 73 N. C. 310; High on Injunctions, sec. 1088; *Gilman v. Hunnewell*, 122 Mass. 139; Browne on Trade-Marks, sec. 33. (4) When trademarks are before the court, the true test of the alleged resemblance is inspection; and the evidence of witnesses is seldom resorted to. *Radam v. Destroyer Co.*, 16 S. W. Rep. 990; *Walton v. Railroad*, 40 Mo. App. 550–554; *Brewing Co. v. Brewing Co.*, 47 Mo. App. 14; *Cope v. Evans*, 22 Weekly Rep. (English) 453; Wharton on Evidence, sec. 436; Abbott's Trial Evidence, p. 752.

ROMBAUER, P. J.—The plaintiff, a tobacco manufacturer in the city of St. Louis, brought this action against the defendant, a tobacco manufacturer of Louisiana, Missouri, for the purpose of restraining the latter from using on plug tobacco manufactured by it any colorable imitation of a horseshoe, which is the plaintiff's trademark on that class of tobacco.

The petition states that, continuously since 1876, the plaintiff and its assignors used the mark of a horseshoe as a trademark for distinguishing certain plug chewing tobacco manufactured by them; that at first this mark was affixed to each one pound plug by way of a paper tag, but since the year 1879 it was affixed by way of a tin tag in the following form:

Which mark the plaintiff caused to be recorded in the United States Patent Office and in the county recorder's office of St. Louis. The petition further states that the

assignors of the plaintiff were the first in adopting said mark, and acquired by such adoption an exclusive right therein when affixed to plug tobacco; that the plaintiff's assignors and the plaintiff built up a very extensive trade in this article, which, owing to its tag, became generally known in the trade as horseshoe tobacco.

The petition then states that the defendant, well knowing the premises, thereafter commenced to manufacture and to sell on the same market where plaintiff was selling its said horseshoe tobacco a brand of tobacco, affixing thereto a tin tag (hereinafter designated as tag A) in the following form:

That said mark resembled a horseshoe, and that its use by the defendant was fraudulent and deceptive and designed to mislead the trade and public, and cause on their part the purchase of defendant's tobacco as and for the horseshoe tobacco of plaintiff; that, in 1889, the plaintiff complained to the defendant of said colorable imitation, and the defendant agreed to change its tags so as to avoid all probability of deception, and thereupon did change its tags to the following form (hereinafter designated as tag B):

That the plaintiff still complained of said tag B as an infringement of its trademark, and the parties sub-

mitted the question to an arbitration of the executive committee of the Trade-Mark Association of Plug Tobacco Manufacturers, who made a unanimous award that tag "B" would deceive the *consumer* into the belief that the plug marked with it was horseshoe tobacco; that the defendant, being advised of the award of the committee, agreed with plaintiff that said tag "B" should be so altered as to be mutually satisfactory, but that the defendant has failed to make such alteration, and has continued to use said tag fraudulently ever since.

The petition further states, as indicating a fraudulent intent on part of the defendant, that the defendant also imitated the outward appearance of the boxes in which the plaintiff shipped its said horseshoe tobacco; that plaintiff once branded the horseshoe on the outside of its boxes in red, whereupon the defendant began to affix its simulated mark on the outside of its boxes in red; that the plaintiff then changed its brands to blue, whereupon the defendant immediately changed its brands from red to blue; and that the defendant in other respects is fraudulently using a label on boxes containing its tobacco in fraudulent imitation of the plaintiff's labels.

The plaintiff prays for a decree restraining the defendant from offering for sale any tobacco with the tag "B," or any other colorable imitation of plaintiff's horseshoe trademark attached thereto, and also for an account of the profits made by the fraudulent use of plaintiff's trademark. The damages are laid at $2,000.

The defendant's answer generally denies all the allegations of the petition, and specifically denies any fraudulent design on part of defendant to imitate the plaintiff's trademark. It avers that it did in good faith

in the year 1879 adopt a spur as and for its trade-mark to be attached to certain kinds of plug tobacco of its own manufacture, and has used said trademark ever since. It denies that such spur is a colorable imitation of the plaintiff's horseshoe or was intended to be such, or that it is likely to deceive anybody. It admits that plaintiff did complain of the use of said mark by the defendant as a colorable imitation of its horseshoe, but it denies that the defendant agreed to submit the question, whether it was an infringement of plaintiff's trademark, to the Trade-Mark Association of Tobacco Manufacturers. It admits that it was informed that the question had been submitted to said association by the plaintiff, and that thereupon as a matter of courtesy it did authorize its tin tag or trademark to be exhibited to said association, with a proper representation of the facts connected with its use by defendant. It denies that it agreed to abide by the decision of the association, and denies that it ever agreed with plaintiff to cease using said trademark or to make such further changes in the form of the tag as should be mutually satisfactory. It denies the fraudulent imitation of the label on plaintiff's boxes, denies that its trademark ever interfered with that of plaintiff, and prays judgment.

The trial court upon a full hearing dismissed the plaintiff's bill.

For our convenience, all the original exhibits which have been used in the court below have been reproduced in the argument before us. We have carefully examined them, as well as the voluminous record of the testimony given at the trial, and find the facts to be as follows: The plaintiff's title to the use of the horseshoe trademark is not questioned. Its manufacture and trade in that particular brand of plug tobacco is very extensive, its out-put in 1889 being five million, seven hundred and seventy-eight thousand pounds; in

1890, six million, one hundred and thirty-five thousand pounds, and in 1891, five million, four thousand five hundred and five pounds. The defendant's output of all brands of plug tobacco during the year 1890 seems to have been about one million, two hundred thousand pounds. The defendant is the successor of some firms and corporations, which in the main have consisted of the present stockholders of the defendant, and one of these firms (McCune, Palmer & Knight) in the year 1881 adopted the spur as a trademark, and attached to its navy plugs what purports to be a representation of a spur, by way of tin tags in the shape of tag "A," in the same manner in which the plaintiff's horseshoe tags were attached to its navy plugs, and of the same size, color and general appearance. The origin of the mark is stated by one of the defendant's officers to have been owing to the fact, that the defendant had an extensive trade in Texas, then the main cattle state, where the spur would be an attractive mark to cow boys and cattle men generally, although one of the defendant's witnesses, a very extensive cattle dealer, testifies that the spur in itself would not recommend the tobacco to cattle dealers more than any other brand. Before the firm of McCune, Palmer & Knight was absorbed in the defendant corporation, but about the same time as the spur brand was started, the defendant company adopted a "C" as a trademark, it not being clearly shown what the "C" was supposed to stand for, and placed tin tags supposed to represent that letter on its plug tobacco, which tin tags were colorable imitations of a horse shoe. The plaintiff at once complained of both these devices as infringements of its horseshoe mark, and the president of the defendant company gave to plaintiff upon request the following written declaration:

"*To whom it may concern:* The plug chewing tobacco exhibited to us this day by M. G. Smith, attorney of the Drummond Tobacco Company, *with the similitude of a horseshoe* was made by us under the following circumstances: Thirty boxes only were made, when, discovering the similitude to the horseshoe, we have ceased making same, and will make no more in future. Our trademark is a little "c" which we claim is our own."

The defendant's evidence, however, furnishes no explanation why, if its trademark was a little "c," it attached to its plugs a capital "C," the similitude of which to the horseshoe, plaintiff's well-known trademark, the defendant at once conceded.

We further find that, upon plaintiff's complaint of the tag "A," a member of the firm of McCune, Palmer & Knight, who, however, is not now a member of the defendant corporation, called upon the plaintiff's then president, and some conversation was had in regard to avoiding deception by placing the defendant's tags differently on the plug than the plaintiff placed its tags, but that no definite arrangement for the settlement of the matter was arrived at. The defendant's boxes at that time were marked on the outside by a dark plug hat, represented as standing on the flat side of the plug of tobacco, a white spur being prominently displayed in the center of the hat. In the year 1889 the plaintiff's then president, while traveling on the Pacific coast, found in the trade there boxes of the defendant's spur tobacco, labeled on the outside in a manner resembling those of the plaintiff's horseshoe tobacco boxes, and containing in the inside the defendant's plug tobacco marked with tag "A." He at once made complaint by letter, to the secretary of the Trade-Mark Association above referred to, and the secretary in

September, 1889, addressed a letter to the defendant as follows:—

"GENTLEMEN:—The Drummond Tobacco Company complain that the 'spur' tag used by you is so like their 'horseshoe' tag, that it is sold for 'horseshoe' to consumers. Please send us a plug with the 'spur' upon it, such as you sell, for comparison. Also what you have to say about their complaint. An early reply will oblige.

To this letter the defendant replied in the following manner: "As requested in yours of ninth instant, we send you by express to-day a plug of our 'spur' tobacco just as it goes to the trade. On comparing same with 'horseshoe' plug, we think your committee will agree with us that there is no reasonable ground for claiming that it is mistaken for that brand. There is a marked difference in spacing and manner of placing tags on the lump, which, with the wide difference between 'spur' and 'horseshoe' tags, makes it next to impossible to mistake one for the other. We have sold these goods quite largely throughout the South and West since '81, and not a single instance has come to our notice of this having been done. We will be glad to have you advise us of any decision your committee will arrive at in this matter."

The secretary at once sent the plugs of the plaintiff and the defendant to each of the members of the committee of arbitration, all of whom *seriatim*, and without any consultation as far as appears, gave it as their opinion that the defendant's so-called spur tag was likely to deceive the ordinary consumer of plug tobacco into the belief that it was the plaintiff's horseshoe tobacco he was buying. This award of the committee was at once communicated to the defendant.

We find that the Trade-Mark Association of Plug Tobacco Manufacturers is a voluntary association of

plug tobacco manufacturers of the United States, which any manufacturer of the article may join. The assessments by which it is supported are based on the annual out-put of the article by its respective members. Its object is to protect its members in the use of their legitimate trademarks, and of defending them against infringements. It has an executive committee, selected by the members of the association annually, which acts as a committee of arbitration in case of any complaint for infringement made by one member against any other member, or against an outsider. The award of the committee is not conclusive on any member, but, if the controversy is between members of the associa-tion, the association, at its own expense, defends or prosecutes, as the case may be, any suit in the courts growing out of the infringement claimed so as to vin-dicate its award. The only difference between the rights of a member and non-member, in case of an award by the committee in favor of either, is that the non-member must vindicate the award of the committee at his own expense, which, in view of the fact that the non-member contributes nothing towards the support of the association, is natural. The members of the executive committee, as the evidence shows, are persons selected with a view to their competency to deal with the questions before them. Nor is there anything to indicate that it lies in their interest, or in that of the association, to make awards unsupported by the facts of the case, and thereby entail upon themselves and the association the costs of an unwarranted litigation. It was in evidence that in a recent controversy between a member and a non-member of the association the com-mittee made an award in favor of the non-member.

When the defendant was notified of the award of the committee, two of its officers called upon the plaintiff to adjust matters. We find that the discus-

sion at the conference turned upon the question how the spur should be represented on defendant's plugs so as to avoid the possibility of its being taken for the plaintiff's horseshoe. The plaintiff's president drew the representation of a spur which in his opinion could not be mistaken for a horseshoe, it being a spur with a very small band and a very large rowel. The defendant's officers agreed to have similar tags cut by hand and to submit them to plaintiff by letter, and claim that they did so, submitting the tag B. Plaintiff never received any such letter, and, noticing the marketing of the defendant's plugs with the tag B in the latter part of 1890, the plaintiff again complained to the secretary of the Trade-Mark Association of the alleged infringement, and the secretary at once wrote the defendant, advising it of that fact. The defendant, thereupon, wrote a long letter to the secretary, stating what had transpired since the last award, and also sent some of its plugs of tobacco marked with tag "B," claiming that tag "B" was radically different in form and general design from tag "A." This letter concluded:

"We do not believe that any unprejudiced man will say that the spur tag we now use is in any manner an infringement of the Drummond Tobacco Company's horseshoe, or calculated to deceive, and we are perfectly willing to have your executive committee pass on same."

The matter was again laid before the committee of arbitrators, who this time convened and sat as a body. The defendant was represented at that hearing by a person of its own selection. The committee again unanimously decided, each member giving his opinion *seriatim*, that tag "B" was an infringement of plaintiff's horseshoe tag trademark, and liable to deceive the consumer.

The defendant was at once notified of this decision, and refused to state whether it would abide by it.

It replied under date of March 18, 1891, as follows:
"NEW YORK.

"*Theo. E. Allen, Secretary.*

"DEAR SIR:—Referring to your favor sixth inst., advising us of the decision of the executive committee in a matter of complaint of the Drummond Tobacco Company of our 'spur' tag, and asking if we will abide by said decision, will say one of our company has called on the Drummond Company with a view of making such change in the tag as will be mutually satisfactory, and the matter is now under consideration."

We find that thereupon an officer of the defendant company called upon the plaintiff's president and submitted to him a tag, cut out by hand, of zinc, of which the following is a *fac simile* (the same being hereinafter designated as tag "C") :

The plaintiff's president told the officer exhibiting the device to cut it out of tin, put it on the plugs in a box of tobacco, and send him the box of tobacco, as the defendant intended to put it upon the trade. This was never done, and the defendant continued to sell on the markets its tobacco, the same as theretofore, with the tag "B" attached thereto.

Two questions arise for decision upon this record: *First.* Is the defendant's tag "B," as now used and complained of, a sufficiently colorable imitation of plaintiff's horseshoe tag, likely to deceive the ordinary

consumer of the article; and, next, was the adoption and use of the spur tag by the defendant a mere matter of accident, or, if design, a design in good faith without any attempt at piracy upon plaintiff's trade in the horseshoe tobacco. If we conclude that the similitude between the two marks, *as at present used*, is not of a character likely to deceive any ordinary consumer of the article, the judgment dismissing the bill must be affirmed, even though the defendant was guilty of bad faith in the adoption of the symbol originally, because no action can be predicated upon fraud, unaccompanied with damages, even in equity. Courts deal with the principles of ethics only as far as they affect property rights.

It is not claimed, either in the bill or in the evidence, that the similitude between the two tags is likely to deceive either the jobber or retailer. These persons buy the article in larger quantities; it is billed to them as an article of a certain kind; they have ample opportunity of close examination; and, hence, their deception by any simulated trademark, short of a downright forgery, is out of the question. The consumer of the particular article is to be considered almost exclusively in determining the question of infringement, because, in the case of an attempted deception, he is substantially the only party likely to be deceived. *Sykes v. Sykes*, 3 B. & Cr. 541; *Farina v. Silverlock*, 1 K. & J. 509; *Rose v. Loftus*, 47 L. J. Ch. 576; *Singer Mfg. Co. v. Loog*, 18 Ch. D. 395, 412.

It is a notorious fact, amply supported by the evidence in this case, that consumers of plug tobacco consist in the main of persons engaged in manual labor, who purchase the article without close scrutiny, and mostly in small quantities, known as ten-cent cuts, and that it is for this reason that the little tin tag is attached to the plugs in short intervals so as to show

one on each ten-cent cut.   The evidence further shows
that this class of purchasers generally call for the
article by the brand, and cannot give a very critical
examination to the tag, as they have neither the means
of comparison nor the facilities for careful examina-
tion.

It is not essential to the right of relief to show that
anyone was actually deceived.   *Filley v. Fassett*, 44 Mo.
168.   The evidence in this case however shows, and we
so find, that some purchasers were actually thus deceived,
the retailer handing them defendant's spur tobacco when
they called for the plaintiff's horseshoe, and that the
similitude in the external appearance of the boxes and
the general appearance of the tag was such that, in two
instances, even the plaintiff's salesmen were deceived by
looking at the boxes from some distance.   There is ample
and credible testimony, offered by the plaintiff by way
of expert opinion on the part of salesmen and others,
of a likelihood of deception, and such testimony finds
corroboration in the award of the executive committee
of the Trade-Mark Association, whose competency to
pass upon the question as experts is conceded in the
defendant's letter of February 20, 1891.

The defendant's counsel urge with zeal and learn-
ing that the question of similitude is after all a question
of mere inspection, and, as all the exhibits used upon
the trial are before us, we have the same facilities for
determining the question as the witnesses examined
and the committee of arbitration had, and that we
should pass our judgment upon the evidence of inspec-
tion.   That the main test of the alleged resemblance is
inspection, has been frequently decided (Abbott's Trial
Evidence, 752), but it has also been decided with equal
uniformity that the resemblance need not be such as
would deceive persons seeing the two marks side by
side.   *Seixo v. Provezende*, 1 Ch. App. Cas. 191, 195;

*Colman v. Crump,* 70 N. Y. 573, 578; *Hier v. Abrahams,* 82 N. Y. 519; *Pike Mfg. Co. v. Stone Co.,* 35 Fed. Rep. 896; *McCann v. Anthony,* 21 Mo. App. 83. The rule is similar whether the alleged infringement relates to a trademark, trade label or trade name, as the underlying principles are the same. The court cannot upon bare inspection determine whether an ordinary customer, having neither the opportunity for comparison nor time for examination, would likely be deceived by the similarity of the marks. On that question the opinion of witnesses familiar with the trade, and the habits of the customer, is of weight, and, when aided by evidence of instances of actual deception, should be controlling, unless the dissimilarity between the two marks is such as to exclude any probability of deception. Guided by these considerations, we conclude that the plaintiff's evidence makes out a *prima facie* case that the defendant's so-called spur tag "B" is, under the circumstances shown in evidence, an infringement of plaintiff's trademark of the horseshoe tag.

This brings us to the second and not less important part of the inquiry, whether the adoption of the spur tag by the defendant as a trademark was a mere matter of accident, unaccompanied by any design of illegal encroachment on the plaintiff's trade. We go into the inquiry, owing to the voluminous evidence adduced by defendant tending to show that the similitude between the two tags is not such as to *deceive any person using ordinary caution,* and hence no serious injury has resulted or can result to plaintiff's proprietary rights by the alleged interference. We state at the outset that, while fraud on defendant's part is in no way essential to protect plaintiff's proprietary rights in the trademark from interference when the interference is made out by the unequivocal proof, yet less cogent proof of the probability of deception will suffice where an intention to deceive

is shown.   The merchant or manufacturer, who by an
unfortunate accident adopts a trademark already in use
by another, occupies in a court of conscience a differ-
ent position from one who, knowing of the other's
trademark, and designing to profit by the reputation
established through the efforts of another, seeks to get
part of the benefit of the trade and reputation of the
other by means of a colorable imitation of his trade-
mark.   Fraud was the very origin of the exercise of
jurisdiction of courts of equity in this class of cases.
This distinction is obvious, and has been frequently
recognized.     Browne   on   Trade-Marks,   sec.   202.
*Mc Lean v.  Fleming*, 96 U. S. 245; *Curtis v. Bryan*, 2
Daly, 312; *Edelsten v. Vick*, 11 Hare, 78.   "The
finding of a fraudulent design must in itself, to some
extent at·least, influence the finding of the court as to
the similarity of the imitation, because, whenever the
similarity is such as may probably deceive, it comes
with ill grace from the defendant to say that he intended
to deceive but failed because the resemblance was not
close enough.   If either party is entitled to the benefit
of a presumption in the case above stated, it is the
plaintiff and not the defendant."    *The American
Brewing Co. v. Brewing Co.*, 47 Mo. App. 14, 22.   We
have announced and acted upon this rule in many
cases.   *Sanders v. Jacob*, 20 Mo. App. 96; *McCann v.
Anthony*, 21 Mo. App. 83; *Trask Fish Co. v. Wooster*,
28 Mo. App. 408, 419; *Plant Seed Co. v. Plant & Seed
Co.*, 23 Mo. App. 579.

As bearing upon this question, we find the facts to
be as follows:    All the different firms and corporations,
which by succession now form the defendant company,
were all along familiar with the plaintiff's horseshoe
trademark, and knew that the tobacco marked with
the horseshoe tag, and known as horseshoe tobacco, had
an extensive reputation.   With full knowledge of that

fact, the firm of McCune, Palmer & Knight, defendant's assignor, adopts a spur as a trademark, and places a tin tag purporting to represent a spur upon their plug tobacco in exactly the same manner as the plaintiff's is placed, and creasing their tobacco in the same manner as the plaintiff's is creased. The representation of this so-called spur has a short shank, the tag exhibiting the flat side of the band of the spur and of the shank and rowel, which we need not say is an impossible representation of a spur from any point of view. Plaintiff complains of this tag as an infringement, and the firm promises to remedy matters so as to avoid deception. Shortly afterwards the defendant corporation places upon its tobacco a tag in the shape of a capital C, and, when the plaintiff complains of it as an infringement, it at once admits that this tag is a similitude of plaintiff's horseshoe, and desists. The defendant, having by this time acquired the spur brand from the firm of McCune, Palmer & Knight by assignment, does away with the outside box label of the spur tobacco used by McCune, Palmer & Knight, namely a black hat with a white spur across it, and places on the outside of its boxes a label of a plug crossed with a spur in the identical manner in which the plug on the label used on plaintiff's boxes is crossed by a horseshoe. No explanation of how this change came to be made is given, nor is any satisfactory explanation given why the color of the branded spur on the outside box is changed so as to correspond with the color of plaintiff's boxes containing the horseshoe tobacco. It is highly improbable that all these coincidences are results of mere accident, and, in the absence of any satisfactory showing that they were the results of accident, we must conclude that they were the result of a deliberate design to obtain part of the benefit of the reputation acquired by the article manufactured by plaintiff through the

means of a colorable imitation of its distinguishing mark.

It is also shown by the evidence of disinterested witnesses (and, although this evidence is contradicted by the defendant, we find the occurrences probable) that the defendant's traveling salesmen, in pushing the spur tobacco in the market, designated it as the new horseshoe or spur, they being offered special inducements for pushing this particular brand. We also find that, in isolated instances, such salesmen suggested to the retailers that, on cutting the plug into five-cent pieces and thereby severing the spur tag, there would be left a horseshoe on one piece and on the other a star, and that some retailers availed themselves of the suggestion. The star brand of tobacco, on which the star is somewhat similar to the rowel on the spur tag, was and is a favorite brand in the western market. It is the same trademark, the infringement of which by a fraudulent and spurious imitation, called the "buzz saw," was perpetually enjoined by the supreme court of this state in *Liggett & Myers Tobacco Co. v. Sam Reid Tobacco Co.*, 104 Mo. 53. That the Sam Reid above named, as is shown by the evidence, is a former bookkeeper of the Tinsley Tobacco Company, a son-in-law of Addison Tinsley, and is the party who was selected to represent, and who did represent, the defendant in the arbitration had before the Trade-Mark Association in the case at bar, is also an unfortunate coincidence.

We recite these minor facts, not because we consider they would be entitled to consideration if standing alone, but, because, in the aggregate, they are entitled to some weight in connection with the other facts in determining the defendant's good faith in the premises.

It results from the foregoing that the judgment of the trial court, dismissing the bill, must be reversed. The only remaining inquiry is, what judgment we

should render under the statute, which commands us to render such judgment as the trial court should have rendered.

The plaintiff's bill contains a prayer for general relief. It also contains a prayer for specific relief as follows:

"That said defendant, its agents, servants and employes may be perpetually enjoined and restrained from manufacturing, selling (or offering for sale), directly or indirectly, any plug tobacco having affixed thereto the mark of a 'horseshoe,' not the genuine mark of plaintiff, or the mark used by defendant and heretofore last described, or any other colorable imitation of plaintiff's 'horseshoe' tobacco trademark as hereinbefore stated, which has made plaintiff's tobacco known by the name of 'horseshoe' tobacco.

"That defendant may be compelled to render before this court a full, true and perfect account of all profits of every description which it has made by use of the simulated mark aforesaid, and that the said defendant may be decreed to pay over to plaintiff all such profits."

We shall grant no relief to plaintiff under its prayer for an account in this proceeding. The facts that for many years the defendant has used the spur tag in various shapes and forms, and for part of the time without any active objection on part of the plaintiff, and that different changes were introduced in its shape and general appearance, in the various attempts to settle the matter amicably, raise propositions which make it difficult to determine the exact data which form the elements of such an account, even if plaintiff were entitled to it. Hence, without prejudice to plaintiff's rights, we shall make no order on that part of the plaintiff's bill, leaving it at liberty, if so advised, to proceed at law for damages. We, however, decree that

the defendant, its servants and agents be perpetually
enjoined from marking either the plug tobacco manu-
factured by them, or the outside of the boxes in which
such tobacco is shipped and exposed for sale, with the
tag hereinabove mentioned as tag B, or any other
colorable imitation of plaintiff's horseshoe trademark;
the defendant to be at liberty to use for that purpose, if
they so desire, tag C, both on their plugs of tobacco,
and on an outside label of their boxes, and, if used on
the outside labels of their boxes, the spur to be placed
lengthwise on the plug, or else in some other manner
distinct from the relative positions of the plug and
horseshoe on plaintiff's boxes. So ordered. Judge
THOMPSON concurs. Judge BIGGS does not participate
in the decision.

### ON MOTION FOR REHEARING.

THOMPSON, J.—The motion for rehearing which
has been filed in this case is not authorized by any exist-
ing rule of the court. It merely proceeds on the ground
that the court, in weighing the evidence, has decided
the cause erroneously, and upon that assumption it asks
for a rehearing. This court has, however, always been
ready to waive its rule and to grant a rehearing in any
case where it has become satisfied that it has committed
a mistake, and it has always been glad when counsel
would point out its mistakes. The conclusion of the
oral argument in this cause left me with the distinct
impression, that the device of the spur, as adopted and
used by the defendant corporation and its predecessors
as a trademark, was adopted, devised and used with the
purpose of pirating the trademark of the plaintiff; but
I had serious doubts whether the defendant's trademark,
in the modified form in which it was used at the
commencement of this action, had sufficient resem-

blance to the trademark of the plaintiff to deceive even the incautious and unwary among the retail purchasers of this species of goods.   With both of these questions in mind, I have examined this record with great care, reading every line of it, and especially making examinations of those portions to which our attention has been invited on the part of the defendant.   These examinations have confirmed the impression which I acquired at the argument, that the defendant's trademark of the spur has been adopted and used with the design of obtaining advantage from the reputation of the goods sold by the plaintiff under its trademark of the horseshoe.  Upon this question I have no doubt at all.  To my mind the stress of the case, if there is any, lies in the question whether the design of the spur, as at present used by the defendant, referred to in the opinion of the court as tag B, is of such a nature as to deceive even the incautious and unwary among the retail purchasers of chewing tobacco.   I say the incautious and unwary, because I am of the opinion that, where a tradesman has adopted a trademark with the deliberate purpose of deceiving and infringing the trademark of another, and deriving profit from the reputation of the goods of that other, it is sufficient, if the similitude between his trademark and the trademark of that other is sufficient to deceive the incautious and unwary and that it is not necessary, to entitle the other party to injunctive relief, that the resemblance should be so close as to deceive purchasers exercising ordinary care and prudence. The plain reason is that many persons are incautious and unwary; and, hence, equity will not permit one tradesman fraudulently to adopt such a device as will enable him to abstract a portion of the trade of another by diverting to himself the incautious and unwary among the customers of that other.   This was the

ground on which this court proceeded in the decision of the case of *Sanders v. Jacob*, 20 Mo. App. 96. In that case the plaintiff had devised a sign to designate his business of a dentist the words "New York Dental Rooms," and the defendant, with the purpose of deflecting from the plaintiff some of his trade, opened a dental establishment near that of the plaintiff under the name and sign of the "Newark Dental Rooms." Here it was obvious that, there was, no such similitude between the two trade names, as would deceive careful and prudent people. It was equally obvious that there was such a similitude as would deceive the incautious and unwary, and there was evidence that such persons had been deceived. We, therefore, held it a case in which the defendant ought to be enjoined from the use of the word "Newark" in connection with his dental rooms. So in this case, while the evidence for the defendant, upon the general question of the probability of the defendant's spur tag, as at present used upon its tobacco, deceiving purchasers, preponderates over the evidence of the plaintiff, yet the evidence of the plaintiff, delivered by the mouth of expert and credible witnessess, is to the effect that the defendant's device has a tendency to deceive retail purchasers; and the plaintiff has further adduced evidence, which we are not at liberty to disregard, that in some cases it has had that effect. As there has been, in my opinion, a plain attempt on the part of the defendant to infringe the trademark of the plaintiff, I do not think that they are in such a position as to require us to say, in the face of this evidence, that their attempt has not been successful, and is not likely to be successful. Besides, it is to be borne in mind that the evidence adduced by them, except that which belongs to the domain of opinion evidence, is of a negative character. It consists of the testimony of dealers in various places, that they have

known of sales of both brands of tobacco, and have not known of customers being deceived by the similitude of the two trademarks. Such evidence might be multiplied almost indefinitely, and yet it would have only a persuasive effect in rebutting distinct evidence to the effect that purchasers had been so deceived in other places and under other circumstances. If I could bring my mind to the conclusion that the defendant's trademark had been innocently adopted, I should not be prepared to say that there is a sufficient similitude, or upon the evidence a sufficient probability of confusion, between the plaintiff's trademark and that of the defendant, to warrant injunctive relief.

We are further asked to transfer this cause to the supreme court, on the ground that there is an amount in controversy in excess of the pecuniary limit of our jurisdiction. We could not stultify ourselves by making such an order now, after hearing and deciding the cause on its merits, unless plainly convinced by some new suggestions that we were wrong in taking jurisdiction in the first instance. The only suggestion supporting this contention is that there is evidence in the record on the part of the defendant that it and its predecessors have expended far more than $2,500, the pecuniary limit of the jurisdiction of this court, in advertising its brand of tobacco, known as the spur tobacco. One member of the defendant corporation testified that, if he had the money that had been expended, he would be willing to retire from the tobacco business, and another testified to the belief that the amount so expended was more than $10,000; but neither of them could give even an approximate amount. Assuming that it was more than $10,000, yet that fact does not furnish any ground for ousting the jurisdiction of this court. Our decree does not prohibit the defendant from advertising its brand known as the

spur tobacco. It merely prohibits it from advertising it by a device in the similitude of the device adopted by the plaintiff in advertising its horseshoe brand. Moreover, it expressly leaves it at liberty to use the device referred to in the opinion as tag C, the same being substantially the device which it, on the last conference with the plaintiff, agreed to adopt, as we find from the evidence, but which it failed to adopt. Our decree does not, therefore, suppress the defendant's trademark at all, nor confiscate the property which it has in it, nor deprive it of the fruits of the moneys it has expended in advertising the brand designated by it; but it merely requires it to make such a change in its device, as will not deceive customers into the belief that its tobacco is the brand known as the horseshoe brand of the plaintiff, and it leaves it at liberty to adopt, in designating its brand of goods, the device which it proposed to the plaintiff to adopt.

The motion for rehearing, and the motion to transfer the cause to the supreme court for want of jurisdiction, are both overruled. Judge Rombauer concurs. Judge Biggs does not participate in the decision of these motions.